<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANWAN L.,<br><br>     Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>     Defendant. | Civil Action No. 21-1397 (SDW)<br><br>**OPINION**<br><br>July 5, 2022 |

**WIGENTON**, District Judge.

  Before this Court is Plaintiff Anwan L.'s ("Plaintiff")[1] appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner") with respect to Administrative Law Judge Beth Shillin's ("ALJ Shillin") denial of Plaintiff's claim for supplemental security income ("SSI") under the Social Security Act (the "Act").  This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Venue is proper pursuant to 28 U.S.C. § 1391(b).  This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, this Court finds that ALJ Shillin's factual findings are supported by substantial evidence and that her legal determinations are correct.  Therefore, the Commissioner's decision is **AFFIRMED**.

---

[1] Plaintiff is identified only by his first name and last initial in this opinion, pursuant to Chief District Judge Freda Wolfson's Standing Order 2021-10, issued on October 1, 2021, *available at* https://www.njd.uscourts.gov/sites/njd/files/SO21-10.pdf.

**I.     PROCEDURAL AND FACTUAL HISTORY**

   **A.     Procedural History**

Plaintiff filed for SSI on June 29, 2017, alleging disability as of May 6, 2013, due to a gunshot wound and memory loss. (D.E. 5 (Administrative Record ("R.")) at 94.) The state agency denied Plaintiff's application both initially and on reconsideration. (R. 117–19, 124–26.) Plaintiff testified at an administrative hearing before ALJ Shillin on October 3, 2019. (*See* R. 36–92.) On March 9, 2020, ALJ Shillin issued a written decision finding that Plaintiff was not disabled. (R. 12–29.) On December 1, 2020, the Appeals Council denied Plaintiff's request for review. (R. 1–3.) Plaintiff subsequently filed the instant appeal in this Court. (D.E. 1.) The parties completed briefing and Plaintiff did not file a reply. (D.E. 15, 18.)[2]

   **B.     Factual History**

Plaintiff is 33 years old and alleges that he has been disabled since he was 24 years old. (R. 94.) He attended twelfth grade but did not graduate from high school. (R. 41–42.) Plaintiff does not have any relevant past work. (*Id.*) The following is a summary of the relevant medical evidence in the record.

Plaintiff was shot in the leg and back in 2006 and twice in the head in 2013. (R. 45, 75.) He was incarcerated for several years in New Jersey, first at the Essex County jail and then at South Woods State Prison, and he was released on August 20, 2017. (R. 42–50.) Plaintiff underwent several procedures and surgeries at the hospital wing of the Essex County jail in 2014 to remove the bullets and part of his scalp. (R. 47, 59.) Although he has a record of seizures and

---

[2] Plaintiff failed to include a proper "statement of facts with references to the administrative record" in his moving brief, disregarding Local Civil Rule 9.1(e)(5)(C). The purpose of the section is not merely to summarize the procedural history of the case, but to provide an overview of Plaintiff's medical records, especially those records that support his disability claim. Plaintiff's attorney is advised that filing non-compliant briefs in the future may result in sanctions, including dismissal.

headaches, Plaintiff did not experience seizures or strong headaches while incarcerated at South Woods State Prison, and the prison records do not show complaints related to his gunshot wound between 2015 and 2016. (R. 60; *see* 365–83, 450–55, 630–47, 708–14.) In March 2017, Plaintiff was prescribed Excedrin at South Woods State Prison after reporting pressure on the left side of his head, but two days later he stated that he was no longer in pain and refused further medication. (R. 362–63.)

On August 28, 2017, following his release from prison, Plaintiff was treated at the University Hospital Emergency Room in Newark, New Jersey for intermittent headaches and drainage from his head wound. (R. 494.) During his examination, he denied having agitation or behavioral problems and showed normal mood, affect, and behavior. (R. 494, 496.) In October 2017, Plaintiff was awake, alert, and oriented during examination, the skin on his cranioplasty site and head gunshot wound had healed, and there was no active draining from his wound. (R. 529.)

Plaintiff suffered his first seizure on October 19, 2017. (R. 513.) At that time, Plaintiff had not taken his anti-epileptic drugs (AEDs) for about four years, and his urine toxicology was positive for cannabinoids. (R. 513, 515.)[3] During the examination, he was alert and oriented, had normal coordination, and had no cranial nerve deficit. (R. 514.) On that day, Plaintiff was differentially diagnosed with post-TBI seizure vs. electrolyte abnormality vs. drug intoxication and prescribed Keppra to control his seizures. (*Id.*) In December 2017, an internal medicine doctor prescribed Plaintiff Tylenol OTC and naproxen to treat his headaches and advised him that continued marijuana use would not help with his headaches. (R. 1338.)

---

[3] In fact, the record shows that Plaintiff often used cannabis from 2011 to 2017, even while incarcerated. (*See e.g.*, R. 352, 355, 357, 362, 451, 670, 726.)

3

In January 2018, Plaintiff visited the ER for a severe headache that was not resolved with naproxen as usual, as well as for new onset drainage from his gunshot wound. (R. 1218, 1221.) On February 7, 2018, Plaintiff reported mild headaches and active leaking from his gunshot wound. (R. 531.) The next day, during a neurological examination, Plaintiff reported severe daily headaches but presented with normal mental status, cranial nerves, motor, coordination, and gait, and he remained seizure-free while conscientiously taking his medications. (R. 533, 535.) A neurologist found his headaches to be consistent with post-traumatic/post-surgical headaches, given their temporal relation, and suggested preventive medication and some lifestyle changes to treat them, including good sleep, eating habits, water intake, and exercise as tolerable. (R. 536.) In May 2018, Plaintiff reported that his headaches had somewhat subsided in frequency and intensity since starting and being compliant with his medications. (R. 561.)

Plaintiff returned to the ER due to seizure activity on October 6 and November 20, 2018. (R. 577, 1081.) On the first occasion, Plaintiff was alert and oriented, he had tolerable headaches, and he admitted he had skipped his medication for two months and thrown it away. (R. 1106, 1109, 1111.) In November 2018, Plaintiff's Keppra levels were not detectable, and his urine test was again positive for cannabinoids. (R. 1085–86.)

In January 2019, Plaintiff's doctor asked him to taper his Keppra dosage and increase his Depakote dosage due to concerns about changes in his personality and behavior. (R. 1418.) However, in July 2019, Plaintiff's AED levels were not detectable, and his report during a neurological assessment suggested that he was taking Keppra instead of Depakote. (R. 1444.) On March 26, 2019, Plaintiff visited the ER due to multiple seizure episodes. (R. 1031–32.) His blood test did not detect Keppra, and a screening showed positive findings of amphetamines, benzodiazepines, and cannabinoids. (R. 1038–39.) On August 15, 2019, Plaintiff suffered another

seizure, but he refused bloodwork, calling into question his medication compliance. (R. 1454, 1458.) On August 27, 2019, Plaintiff presented to the ER after having three more seizures—on that day, his Depakote levels were low. (R. 978, 980.) On November 8, 2019, Plaintiff's Depakote was at therapeutic levels during a neurological exam. (R. 956.) His seizures remained controlled after he started to take and remained compliant with his anti-seizure medications, Depakote and Keppra. (R. 557, 559, 561, 1367, 1377, 1405.)

State agency physician Joseph Sobelman, M.D., reviewed Plaintiff's medical records on October 18, 2017, and concluded that Plaintiff's function report was neurologically benign, as it was while he was in prison. (R. 99.) Dr. Sobelman noted that Plaintiff's medically determinable impairment was not severe and would not significantly limit his physical or mental ability to perform basic work activities. (R. 99–100.) State agency physician Mary Ann Nicastro, M.D., affirmed Dr. Sobelman's findings on January 22, 2018. (R. 109.)

Psychologist Edward Linehan, Ph.D., performed a consultative examination on Plaintiff on February 20, 2018. (R. 544–47.) Dr. Linehan concluded that Plaintiff "appear[ed] to be functioning within the intellectually disabled range on a brief test of cognitive abilities." (R. 546.) However, state agency psychologist Amy Brams, Ph.D., reviewed Plaintiff's records on February 21, 2018, and concluded that Plaintiff was well-oriented and able to follow simple instructions, attend and concentrate, keep adequate pace and persist, and adapt to routine tasks in a work situation. (R. 114.) Dr. Brams assessed Plaintiff to have mild difficulties interacting with others and moderate difficulties in the other three areas of functioning. (R.111.) She opined that neither Plaintiff's medical records nor activities of daily living supported a finding that he functioned in the intellectually disabled range. (R. 114.)

### C. Hearing Testimony

Plaintiff appeared with his attorney and testified at an administrative hearing before ALJ Shillin on October 3, 2019. (*See* R. 36–92.) Plaintiff had no difficulty following the conversation, and thoroughly answered the ALJ's questions. (*See* R. 41–84.) He testified that he cares for himself, attends to his hygiene, prepares his breakfast, watches television, spends time with family and a friend, and speaks on the phone with relatives. (R. 71–72.) He helps his friend's three- and six-year-old children get ready for school, sometimes picks them up from school, plays with them, takes them to the park, and helps the six-year-old with homework. (R. 72–74.) His brother takes him to the park to exercise and both of his siblings ask him to help move things around. (R. 77.) He testified that he can walk but has difficulty standing for too long. (R. 75.) However, he walks and uses public transportation to get around, and he cleans the kitchen and bathroom. (R. 269–70.) His friend cooks for him, but he helps with shopping and carrying the bags upstairs, and he testified that he can lift ten to twenty pounds comfortably. (R. 75–76.) Although he reported having problems paying attention, finishing what he starts, and following instructions, Plaintiff can watch an hour-long television show if it interests him. (R. 76, 272, 311.) When asked about his medications, Keppra and Depakote, he stated that he "didn't take [th]em." (R. 52.)

ALJ Shillin also heard testimony from Eric D. Dennison ("VE Dennison"), an impartial vocational expert, and Plaintiff's partner, Amy Figueroa, a lay witness. (R. 85–91; *see* R. 1032, 1081.) Ms. Figueroa testified that she helps Plaintiff with his medications and ensures that he takes them regularly. (R. 88.) VE Dennison testified that an individual with Plaintiff's vocational background and residual functional capacity ("RFC"), as assessed by ALJ Shillin, could work as a garment sorter, marker, and classifier. (R. 88–89.)

## II.     LEGAL STANDARD

### A.     Standard of Review

In Social Security appeals, this Court has plenary review of the legal issues decided by the Commissioner. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted). Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (internal quotation marks omitted) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). This Court is required to give substantial weight and deference to the ALJ's findings. *See Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which

7

evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 F. App'x. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (internal quotation marks omitted) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221–22 (3d Cir. 1984) (citations omitted).

**B.     The Five-Step Disability Test**

A claimant's eligibility for social security benefits is governed by 42 U.S.C. § 1382. An individual will be considered disabled under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to render the individual "not only unable to do his previous work but [unable], considering his age, education, and work experience, [to] engage in any kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A claimant must show that the "medical signs and findings" related to his or her ailment have been "established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C. § 423(d)(5)(A).

To make a disability determination, the ALJ follows a five-step sequential analysis. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also Cruz*, 244 F. App'x at 480. If the ALJ determines at any step that the claimant is or is not disabled, the ALJ does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Step one requires the ALJ to determine whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is defined as work that "[i]nvolves doing significant and productive physical or mental duties . . . for pay or profit." 20 C.F.R. §§ 404.1510, 416.910. If the claimant engages in SGA, the claimant is not disabled for purposes of receiving social security benefits regardless of the severity of the claimant's impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the individual is not engaging in SGA, the ALJ proceeds to step two.

Under step two, the ALJ determines whether the claimant suffers from a severe impairment or combination of impairments that meets the duration requirement found in Sections 404.1509 and 416.909. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or a combination of impairments is not severe when medical and other evidence establishes only a slight abnormality or combination of abnormalities that would have a minimal effect on an individual's ability to work. 20 C.F.R. §§ 404.1521, 416.921; Social Security Rule ("SSR") 85-28, 96-3p, 96-4p. An impairment or a combination of impairments is severe when it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). If a severe impairment or combination of impairments is not found, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the ALJ finds a severe impairment or combination of impairments, the ALJ then proceeds to step three.

Under step three, the ALJ determines whether the claimant's impairment or combination of impairments is equal to, or exceeds, one of those included in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If an impairment or combination of impairments meets the statutory criteria of a listed impairment as well as the duration requirement, the claimant is disabled and entitled to benefits.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If, however, the claimant's impairment or combination of impairments does not meet the severity of the listed impairment, or if the duration is insufficient, the ALJ proceeds to the next step.

Before undergoing the analysis in step four, the ALJ must determine the claimant's RFC.  20 C.F.R. §§ 404.1520(a), 404.1520(e), 416.920(a), 416.920(e).  An individual's RFC is the individual's ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments.  20 C.F.R. §§ 404.1545, 416.945.  The ALJ considers all impairments in this analysis, not just those deemed to be severe.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); SSR 96-8p.  After determining a claimant's RFC, step four then requires the ALJ to determine whether the claimant has the RFC to perform the requirements of his or her past relevant work.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  If the claimant is able to perform his or her past relevant work, he or she will not be found disabled under the Act.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f).  If the claimant is unable to resume his or her past work, the disability evaluation proceeds to the fifth and final step.

At step five, the ALJ must determine whether the claimant is able to do any other work, considering his or her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  Unlike in the first four steps of the analysis where the claimant bears the burden of persuasion, at step five the Social Security Administration ("SSA") is "responsible for providing

evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's RFC] and vocational factors." 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2). If the claimant is unable to do any other SGA, he or she is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III. DISCUSSION

### A. The ALJ's Decision

On March 9, 2020, ALJ Shillin issued a decision concluding that Plaintiff was not disabled under the Act. (R. 29.) At step one, the ALJ found that although Plaintiff had worked, his work activity had not risen to the level of substantial gainful activity since his June 29, 2017, application date. (R. 14.)[4] At step two, the ALJ found that Plaintiff has five severe impairments: (1) status-post gunshot wound to the head with remaining bullet fragments and sequelae of memory loss and cognitive slowing; (2) status-post gunshot wound to the right leg and lower back; (3) seizure disorder; (4) anxiety disorder; and (5) depressive disorder. (R. 14.) At step three, the ALJ concluded that Plaintiff's impairments, individually and in combination, did not meet or medically equal the severity of any Listing. (R. 15–16.) ALJ Shillin specifically analyzed the requirements of Listings 11.02 (epilepsy), 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders). (*Id.*)

Prior to step four, ALJ Shillin assessed Plaintiff's RFC and found that Plaintiff could:

[P]erform light work . . . except the claimant cannot climb ladders/ropes/scaffolds; cannot work with heavy machinery or at heights; and can only occasionally climb ramps/stairs, crouch, crawl, stoop, kneel and balance. The claimant is able to perform simple, repetitive and routine tasks and have occasional contact with the general public, coworkers and supervisors.

---

[4] Plaintiff is not eligible for SSI benefits for any time period that overlaps with his incarceration or that predates his application date. *See* 42 U.S.C. § 1382(e)(1)(A); 20 C.F.R. § 416.501.

11

(R. 17; *see* R. 17–27.)  At step four, the ALJ found that Plaintiff had no relevant past work.  (R. 28.)  At step five, the ALJ relied on VE Dennison's testimony to find that Plaintiff could perform the requirements of occupations such as garment sorter, marker, and classifier.  (R. 28, 89.)

    **B.**        **Analysis**

On appeal, Plaintiff seeks reversal or remand of the Commissioner's final administrative decision.  (*See* D.E. 15 at 3.)  Plaintiff asserts that (1) his physical and mental impairments establish a medical equivalence with the Commissioner's Listing of impairments and that (2) the ALJ's RFC assessment was not based on substantial evidence.  (*See id.* at 4–26.)  This Court considers the arguments in order and finds each unpersuasive.

First, Plaintiff argues that the ALJ erred at step three when comparing the effect of his impairments with one or more of the Listings.  (*See id.* at 4–17.)  Plaintiff contends that the ALJ did not compare the joint effect of all impairments—including his seizures, headaches, and physical injuries—against one of the Listings to determine medical equivalence.  (*See id.* at 6–11.)  However, it is Plaintiff's burden to prove that he meets or equals the criteria set forth in a particular Listing.  *See* 20 C.F.R. § 416.912(a).  Although Plaintiff argues that the ALJ improperly considered his medication noncompliance and failed to discuss certain Listings, he does not identify a Listing that he meets or provide an explanation of how he meets or equals all the requirements of any Listing.  (*See* D.E. 15 at 6–11); *see also Sullivan v. Zebley,* 493 U.S. 521, 530 ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."). For example, although Plaintiff argues that the ALJ did not consider his severe impairments or his headaches and procedures, he does not explain how such impairments are relevant or demonstrate that he meets the criteria of a Listing.  (*See* D.E. 15 at 8–10.)  Nor does Plaintiff explain how his gunshot wounds, memory loss, or various impairments in combination, meet or equate to a Listing.

(*See* D.E. 15 at 11); 20 C.F.R. § 416. 925(d) ("[I]mpairment(s) cannot meet the criteria of a listing based only on a diagnosis. To meet the requirements of a listing, [plaintiff] must have a medically determinable impairment(s) that satisfies all of the criteria of the listing.").

As for the ALJ's Listings analysis itself, the ALJ correctly evaluated Plaintiff's seizure disorder and found that it did not satisfy the requirements of Listing 11.02. *See* 20 C.F.R. pt. 404, subpt. P, app'x 1, § 11.02. After his first seizure in October 2017, Plaintiff did not suffer another episode until one year later, and his most frequent episodes were a month apart but still below the frequency and duration required by the Listing. (R. 513, 577, 1081.) Furthermore, a claimant must experience seizures "despite adherence to prescribed treatment." *See* 20 C.F.R. pt. 404, subpt. P, app'x 1, § 11.02. The record shows that Plaintiff was noncompliant in taking his anti-epileptic medications for months at a time, (R. 1444, 1454), even throwing them away, (R. 1111), and his seizures occurred when he did not adhere to his prescribed treatment. (R. 513, 1039, 1081–82.) The ALJ justifiably relied on Plaintiff's medication noncompliance as a reason to find that Plaintiff did not meet the Listing. (R. 25); *see* 20 C.F.R. 404.1530 (b) ("In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work.").

With respect to the mental Listings, Plaintiff argues that the ALJ was wrong to find that he does not meet the Paragraph "B" criteria of Listings 12.02, 12.04, 12.06, and 12.15. (*See* D.E. 15 at 11–18.) To satisfy the criteria of Paragraph B, a claimant's mental disorder must result in an "extreme" limitation of one or a "marked" limitation of two of the four areas of mental functioning. 20 CFR Part 404, subpt. P, app'x 1 § 12.00. An extreme limitation is the inability to function independently, appropriately, effectively, and on a sustained basis. (*Id.*) A marked limitation is a seriously limited ability to function independently, appropriately, and effectively. (*Id.*) The four

areas of functioning are mental abilities that a claimant needs to function in a work setting, namely the abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (*Id*.)

Here, ALJ Shillin found that Plaintiff has only moderate limitations in three areas of mental functioning and a mild limitation in one area of functioning. (R. 15–16.) First, she found Plaintiff to be moderately limited in understanding, remembering, or applying information. (R. 15.) Despite Plaintiff's alleged inability to follow written or spoken instructions well and the finding that he was functioning in the intellectually disabled range, the record indicates that he is awake, alert, fully oriented, and able to speak, comprehend, and follow commands when he takes his medications as prescribed. (R. 114, 535, 546, 1366, 1404.) The ALJ also noted that Plaintiff had no difficulty giving thorough and complete answers when questioned or following the conversation during the hearing. (R. 27; *see* R. 41–84.) Next, the ALJ found that Plaintiff is moderately limited in his ability to concentrate, persist, or maintain pace. (R. 16.) The record shows that despite Plaintiff's constant use of illicit drugs, (R. 515, 772, 831, 847, 1038, 1085, 1454), his concentration abilities are normal when he takes his medications, (R. 549, 735, 815, 1402). The ALJ also found that Plaintiff is moderately limited in adapting or managing himself. (R. 16.) She explained that Plaintiff's daily living activities and medical records show that when he resumes his prescribed medications, he can concentrate, care for his personal needs, pay attention, and interact with others. (R. 16; *see* R. 71–77.) Finally, the ALJ concluded that Plaintiff has only a mild limitation in interacting with others, after considering his relationship with his friend and family. (R. 15–16; *see* 71–74.) Although the record shows that Plaintiff's mood occasionally alters, his mood improves when he takes his medications. (R. 549, 735, 815, 1402.)

14

Plaintiff asks this Court to find that he has at least two marked limitations, giving more weight than the ALJ did to Dr. Linehan's opinion (and thus less weight to Dr. Brams's conflicting opinion). (*See* D.E. 15 at 17.) However, ALJ Shillin sufficiently reviewed the medical evidence in the record and provided adequate rationales to explain why she found that Plaintiff's mental impairments did not result in more than moderate limitations. (R. 15–16.) This Court will not reweigh the evidence or impose its own factual determinations. *See Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 359 (3d Cir. 2011). More than a mere scintilla of evidence supports the ALJ's Paragraph B analysis and this Court will not reverse on that basis.

Second, Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. (D.E. 15 at 18.) Specifically, Plaintiff contends that the ALJ should have (1) explained how the evidence supports that he is to perform unskilled light work activity on a sustained basis given his gunshot wound and (2) included off-task and monthly absence limitations in the RFC. (*See id.* at 21–26.)

With respect to Plaintiff's physical RFC, his medical records and daily activities support ALJ Shillin's finding that he can perform light exertional work, with postural and environmental limitations to account for his reports of pain. (R. 26.) The record shows that even when Plaintiff suffered a seizure and complained of back pain in June 2018, he was oriented, displayed normal reflexes, had no cranial nerve deficits, and exhibited normal muscle tone. (R. 1380.) One month after Plaintiff's seizure and back pain complaint in 2018, his back pain was tolerable, and his physical exam once again showed normal findings. (R. 1391.) In October 2019, Plaintiff showed a normal functional cognitive status and reported that his pain and discomfort were manageable. (R. 815.) As the ALJ explained, no treating or examining physician mentioned findings equivalent in severity to the criteria of any listing. (R. 15.) In fact, the ALJ found Plaintiff's physical

conditions to be more limiting than his doctors did. (R. 27, 99, 109–10.) For example, although the state agency physicians found Plaintiff's gunshot wounds to be non-severe, the ALJ assessed severe physical impairments and accounted for them in the RFC. (R. 17, 26.) Plaintiff's medical records from South Woods State Prison and the subsequent medical visits following release do not contain any medical findings that necessitate further limitations. (R. 17–27, 60; *see* 365–83, 450–55, 630–47, 708–14.) On this record, the ALJ was entitled to find that additional physical limitations are not credibly supported and she properly excluded them from the RFC. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

As for Plaintiff's mental RFC, substantial evidence supports ALJ Shillin's findings that Plaintiff could perform simple, repetitive, and routine tasks and occasionally contact the public, co-workers, and supervisors. (R. 24–25.) When Plaintiff followed his treatment, he remained seizure-free, awake, alert, oriented, with intact comprehension, and with a normal ability to speak fluently. (R. 535–36, 558–59, 958, 1402–05, 1417.) As for Plaintiff's ability to sustain concentration, the ALJ properly noted that Plaintiff was able to comprehend, name and repeat, and follow commands. (R. 25.) Although Plaintiff reported struggling with anxiety, depression, and PTSD in 2018, treatment and medical records from County jail did not indicate any psychological issues. (R. 114.) Additionally, although Plaintiff's cognitive abilities were found to be within the intellectually disabled range, he presented a normal mental status, was able to follow simple instructions, comprehend, attend and concentrate, keep adequate pace and persist, and relate and adapt to routine tasks. (R. 114, 535, 546.) Despite Plaintiff's report of a change in mood and personality in 2019, his doctor found that the change was a side effect of Keppra, which he was subsequently asked to taper down for a week and then stop while he increased his dosage of Depakote to control his seizures. (R. 1418.) Plaintiff's daily activities also show that he is able to

perform some work. (*See* R. 71–77.) For example, Plaintiff can care for himself, help others, talk on the phone, go to the park to exercise, clean, carry groceries, take public transportation, play with children, and help with homework. (*Id.*) The record clearly contains more than a mere scintilla of evidence to support the ALJ's mental RFC assessment in this regard.

Finally, Plaintiff argues that the ALJ should have included off-task and monthly absence limitations in the RFC to account for emergency room visits due to his unpredictable seizures and medical appointments. (*See* D.E. 15 at 24–26.) However, the record shows that Plaintiff's ER visits were largely due to medication noncompliance, and his seizures and headaches remained controlled when he adhered to his treatment. (R. 557, 561, 1367, 1377, 1405.) If Plaintiff is compliant with his medication regimen, the record suggests that his medical visits will generally be planned, and there is no reason why he cannot plan them around a work schedule. *See Stull v. Saul*, Civ. No. 19-227, 2020 WL 5774895, at *1 n.1 (W.D. Pa. Sept. 28, 2020).

Given the overall record, including Plaintiff's daily activities and repeated decisions to forgo medication, the ALJ's finding that Plaintiff could perform light work (with additional postural and environmental limitations) and simple, repetitive, and routine tasks (with some social restrictions) is supported by substantial evidence. (R. 25.) This Court will therefore affirm.

IV. **CONCLUSION**

For the foregoing reasons, this Court finds that ALJ Shillin's factual findings were supported by substantial evidence in the record and that her legal determinations were correct. The Commissioner's determination is therefore **AFFIRMED**. An appropriate order follows.

s/ *Susan D. Wigenton*<br>
**SUSAN D. WIGENTON**<br>
UNITED STATES DISTRICT JUDGE

Orig:   Clerk
cc:     Parties